FILED'08 AUG 18 16:45 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )        Criminal Case No. 07-112-KI
                                   )
        vs.                        )        OPINION AND ORDER
                                   )
TRENEIL WASHINGTON,                )
                                   )
                    Defendant.     )
_____    )

        Karin J. Immergut
        United States Attorney
        District of Oregon
        John C. Laing
        Assistant United States Attorney
        1000 S. W. Third Avenue, Suite 600
        Portland, Oregon  97204-2902

                Attorneys for Plaintiff

        Gerald M. Needham
        Assistant Federal Public Defender
        101 S. W. Main Street, Suite 1700
        Portland, Oregon  97204

                Attorney for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Defendant Treneil Washington is charged with possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Before the court is his Motion to Suppress Physical Evidence (#25). For the following reasons, I deny his motion.

## BACKGROUND

I previously concluded that defendant had made "a substantial preliminary showing" in pointing out material omissions of facts that were left out "knowingly and intentionally, or with reckless disregard for the truth," thus warranting a <u>Franks</u> hearing. <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978). We held an evidentiary hearing on June 5, 2008, at which Detective Douglas John Halpin testified. At their request, I gave the parties the opportunity to submit supplemental briefing.

The following facts were adduced at the evidentiary hearing and were contained in the parties' submissions.

I.    <u>Facts Related to Shooting Incident and Investigation</u>

According to his police report, on October 18, 2006, just before 3:00 a.m., Officer Derrick Foxworth, Jr. responded to five 911 calls reporting gun shots around NE Grand Avenue and NE Wygant Street, four of which were received between 2:30 and 2:50 a.m. The fifth 911 call was from Cheritta Caldwell, who reported at 3:04 a.m. that her ex-boyfriend, Treneil Washington, had shot at her. Officer Foxworth reported to the location, which was the King School, but found no crime scene or witnesses. Caldwell returned to the King School to talk with Officer Foxworth.

Caldwell told Foxworth that she had dated Washington sporadically over the last five years, and they had spent the previous day and night together. She told Foxworth that she and a

Page 2 - OPINION AND ORDER

friend, Makeitho Herring, were at a club that night when Washington showed up with another woman. When the club closed at 2:30 a.m., Caldwell and the woman got into a fight outside, at which time Washington pushed Caldwell away, and Herring pushed Washington away.

After leaving the club, Washington called Caldwell's cell phone repeatedly and told her to meet him at the King School. Herring and Caldwell drove to the school and parked the car on the west corner of the school. Caldwell got out of the car and sat on the stairs talking on the phone with Washington while waiting for him. Washington told her, over the phone, "I got something for you." Caldwell thought she saw Washington approach her from the east. The individual stopped 50 to 75 feet away from her and fired three or four shots. She described the shooter as an African-American male, 5'6", 165 lbs, wearing a white t-shirt, white shoes and blue jeans. She said she recognized him because they had been dating on and off for the past five years, and she saw his face during the shooting. After the shots were fired, she asked Washington if he had shot at her, but all she heard from the phone was breathing.

Foxworth interviewed Herring, who said he heard four to five shots but did not see the shooter because he had been sitting in the car.

Police officers searched the area but did not find any shell casings or evidence of a shooting.

Police looked for Washington at a motel near Delta Park where he was reportedly staying, as well as at his last known address on NE Cully Boulevard, both locations only a few miles from King School, but did not find him.

According to his testimony at the evidentiary hearing, when Detective Halpin arrived at work he read Officer Foxworth's report. He did not talk with Officer Foxworth. He met with Caldwell later that day. He picked Caldwell up and returned to the school to look for evidence.

Page 3 - OPINION AND ORDER

She told Detective Halpin that she now was not sure it was Washington, that she was intoxicated at the time, the shooter was at some distance from her, and that someone else told her Washington was not the shooter.  When he questioned her about this last statement, she would not give the name of the person who said it was not Washington.

Detective Halpin did not interview Herring.

Detective Halpin testified that he typically runs the criminal history of a witness, but he has no recollection of whether he did so in this case.  During the investigation, he learned from Washington's probation officer, Jani McCord, that Caldwell was under investigation for stabbing someone in October of 2006.

Detective Halpin talked with Officer Michelle Hughes who had seen Washington earlier the day of the incident.  Officer Hughes described Washington as wearing a dark blue beanie with a black baseball hat over it, black jeans and a white t-shirt with a black pullover on top of it, and white tennis shoes.

Detective Halpin ordered cell phone records for Washington's and Caldwell's numbers, and continued to try to find out where Washington was living.

Caldwell called P.O. McCord, on October 23, 2006, and reported the incident.  Caldwell told P.O. McCord that she had told the police Washington shot at her, but that everyone had been drunk at the time.  She told P.O. McCord that she did not know why she told the police Washington had shot at her, except that she just thought of him when the police asked who did it because they had argued earlier that night.  There is no indication that Detective Halpin learned of this contact or what Caldwell told P.O. McCord.

That afternoon, Washington reported to P.O. McCord and told her he was not anywhere near the King School that night.

Page 4 - OPINION AND ORDER

On October 25, 2006, P.O. McCord left a message for Detective Halpin about the incident. On October 31, 2006, Detective Halpin called P.O. McCord and told her he was still trying to determine what happened, and asked for information if she learned anything. Defendant asserts P.O. McCord told Detective Halpin that Washington denied being near the location of the shooting that night. Detective Halpin does not remember getting this information.

The cell phone records revealed that signals from Washington's phone were being received by a cell phone tower about ten blocks from the King School, but Detective Halpin did not know how far north the tower received signals.

Detective Halpin called P.O. McCord on December 15, 2006 to find out if she had any information, and she said she did not. Detective Halpin told P.O. McCord that he was still investigating the incident. P.O. McCord told Detective Halpin that Washington was scheduled to report on December 20, 2006, at 4:00 p.m.

On December 20, 2006, Detective Halpin called P.O. McCord and told her he wanted to follow Washington from the probation officer's building. Accordingly, P.O. McCord notified Detective Halpin when Washington left the office, at 4:30 p.m.

Officers followed Washington from the office as a team using verbal hand-offs to keep him in view. Washington drove a white 2007 Cadillac, Oregon license number 749 BJA. At 6:58 p.m. officers saw Washington drive to 5296 NE 75th Avenue, and enter a triplex apartment. At 7:35 p.m., officers saw Washington drive to the View Point Gentlemen's Club parking lot. Officers believed Washington met with a person there. Washington returned to 5296 NE 75th. Officers maintained surveillance until 10:30 p.m.

Page 5 - OPINION AND ORDER

On December 21, 2006, at around 7:30 a.m., officers noted that the white Cadillac had been sitting outside the complex for the entire night because the windows were fogged over and icy.

At 11:25 a.m. that morning, Officer Darby saw Washington and two other black men leave the triplex at 5296 NE 75th Avenue and drive away in the white Cadillac. About five minutes later, the Cadillac returned to the building, and one of the men (not Washington) got out of the Cadillac and went into the center door of the triplex. Officer Santos believed that the man was carrying a handgun under his shirt when he returned to the Cadillac.

Unmarked police cars followed the Cadillac from NE 42nd, westbound on NE Killingsworth. The Cadillac turned north on NE 32nd Avenue, and east on Jarrett Street, one block north of Killingsworth, and then south on NE 31st Avenue. The officers reported to Detective Halpin that the occupants of the Cadillac knew they were being followed. Detective Halpin authorized a traffic stop.

Before uniformed officers could signal the Cadillac to pull over, the Cadillac stopped on NE 31st Avenue, three houses south of NE Killingsworth. The two passengers exited the Cadillac, one wearing a blue jacket and other wearing what appeared to be a black jacket. The man in the blue jacket walked south on NE 31st Avenue, and man in the black jacket bent at the waist, straightened up and walked westbound out of sight.

Officers saw the man in the blue jacket drop four dime-size bags of marijuana. Officers found one bag of marijuana and one of crack cocaine lying near the fence of the driveway where the man in black walked. The man in black said his name was Thomas Earl Cooper, and he was the man Officer Santos believed was carrying something under his shirt. Officers searched him and discovered no firearms.

Page 6 - OPINION AND ORDER

Washington was in the driver's seat of the Cadillac. He exited the Cadillac as requested. He was arrested. No contraband was found on his person. The Cadillac was not searched at this time.

Detective Halpin obtained a warrant to search Washington's residence and cars for drugs and firearms.

II.    Unrelated Police Contacts

Defendant reports the following police contacts, which Detective Halpin did not include in his affidavit. Detective Halpin testified that he was not aware of these police contacts.

On November 17, 2006, P.O. McCord received information through LEDS that Washington was at a police bureau counter to pick up Thomas Cooper. (Multnomah County Parole and Probation receives computer-generated notices whenever a parolee has police contact.)

On November 26, 2006, P.O. McCord received information that Portland Police Officer Thomas Snitily had executed a traffic stop on Washington, and that Washington consented to a search without issue.

On December 11, 2006, Washington called P.O. McCord and told her he was a passenger in a friend's car which had been stopped. The friend did not have a license, so Washington drove the car for his friend.

On December 18, 2006, P.O. McCord received a LEDS notice that Portland Police Officer Zachary Kennedy had executed a traffic stop on Washington at NE Cully Blvd and Prescott. Officer Kennedy noted that Washington had been uncooperative, but no arrest was made.

III.     Unrelated Criminal Investigation

Portland Police Officer Hughes used a confidential informant to purchase crack cocaine from Washington. Hughes' report contains no information about the informant, and no officer observed the transaction, nor was an electronic recording made. This information was included in the affidavit.

## LEGAL STANDARDS

I.     Franks Hearing

In Franks v. Delaware, 438 U.S. 154, 164-65 (1978), the Supreme Court held that intentionally and recklessly submitting false statements in a warrant affidavit violates the Fourth Amendment. If perjury or reckless disregard for the truth is established by a preponderance of the evidence, the court must set the "false" material aside and determine whether the "remaining content is sufficient to establish probable cause." Id. at 156. If not, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id. Courts have employed a similar analysis when a defendant alleges the warrant affidavit contains material omissions. United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985). Material omissions should be inserted in the affidavit and examined to see whether probable cause remains.

II.     Probable Cause in Search Warrant

A search warrant must be supported by probable cause. The question is whether, viewing the totality of the circumstances, the judicial officer who issued the warrant had a substantial basis for finding that there was a "fair probability that contraband or evidence of a crime" would be found in the place searched. Illinois v. Gates, 462 U.S. 213, 238 (1983). The issuing court is entitled to draw reasonable inferences about where evidence may be kept, "based on the nature of

Page 8 - OPINION AND ORDER

the evidence and the type of offense." <u>United States v. Angulo-Lopez</u>, 791 F.2d 1394, 1399 (9th

Cir. 1986).  In "borderline cases, preference will be accorded to warrants and to the decision of

the magistrate issuing it." <u>United States v. Terry</u>, 911 F.2d 272, 275 (9th Cir. 1990).

## DISCUSSION

I.    <u>Omissions from the Affidavit</u>

      Defendant contends Detective Halpin excluded the following information from the

affidavit.  The government responds that even assuming all of these items were omitted, adding

them would not affect the probable cause supporting the warrant.  I agree.

      A.    <u>Caldwell's Statements About the Dispute</u>

      In his affidavit, Detective Halpin reported that Caldwell and Washington had been "at

another location arguing and then went their separate ways."  D.'s Mot. to Suppress Physical

Evidence, Ex. A at 4.  In fact, Officer Foxworth's report indicated that Caldwell and Washington

had been at a nightclub, that Washington had shown up with another woman, and that Caldwell

and the *woman* had fought.  Washington pushed Caldwell away from the woman.  The affidavit

neglected to indicate, too, that Caldwell and Washington had spent the previous day and night

together.

      The full report contains relevant information; the fact that Caldwell and the woman had

fought over Washington undermines Caldwell's initial identification of the shooter as

Washington, and supports her later recantation, because the context indicates Caldwell had a

motive to lie about the identity of the shooter.

      Including this information in the affidavit, however, does not tend to negate probable

cause.  First, the additional information merely supplements the fact that Washington and

Caldwell had fought the night of the shooting.  Washington had, after all, pushed Caldwell away

Page 9 - OPINION AND ORDER

from the woman. Second, the additional information equally supports the notion that Washington had a motive to shoot Caldwell so she would no longer interfere with his new relationship. In sum, the two had been arguing, which supports both the inference that Caldwell had a motive to lie, and that Washington had a motive to shoot.

B.    Caldwell's Recantation

In his affidavit, Detective Halpin states the following: "When I personally spoke to CALDWELL on 10-18-06 at approximately 1615, she partially recanted, saying that she didn't actually see who the shooter was. The remainder of CALDWELL's story, about who she was speaking with on the phone (WASHINGTON), where she was and when it happened, remained the same." Ex. A at 4-5.

Detective Halpin did not include in the affidavit Caldwell's full statement to him when she met with him. According to his testimony, she told him she was intoxicated, she was not sure Washington was the shooter, the shooter was at some distance from her, and that someone else told her Washington was not the shooter.

1.    Caldwell's Intoxication

Detective Halpin omitted Caldwell's statement that she was drunk at the time of the shooting, and this detail might have reflected on her judgment at the time of the 911 call and supported her later statement that she was not sure Washington was the shooter.

Although the affidavit would have given the reviewing judge a more complete picture had the information been included, I cannot say this omission alone would have affected the probable cause outcome. Neither Officer Foxworth, who interviewed Caldwell immediately after the incident, nor the 911 dispatcher commented on Caldwell's lack of sobriety. Furthermore, statements made while intoxicated are not per se unreliable. See United States v. Damitz, 495

Page 10 - OPINION AND ORDER

F.2d 50, 56 (9th Cir. 1974) (police "did not feel that [the informant] was either under the influence of heroin or in a state of withdrawal" so could rely on statements); Hale v. Kart, 396 F.3d 721, 730 (6th Cir. 2005) ("Although it is possible that an angry and intoxicated person may be less reliable than a detached and uninterested observer who is sober, it is equally possible that those same factors can make a witness more inclined to be truthful than they otherwise might."). Accordingly, including both the fact that Caldwell said she was drunk, along with the information that Officer Foxworth did not comment on her lack of sobriety, does not detract from the finding of probable cause.

       2.   Caldwell's Identification of the Shooter

Detective Halpin characterized Caldwell's subsequent statements to him as a partial recantation, reporting that she "didn't actually see who the shooter was." Ex. A at 4-5. Her full statement to Detective Halpin was that she was not sure Washington was the shooter, the shooter was at some distance from her, and that someone else told her Washington was not the shooter.

Caldwell was the only witness to the shooting, there is no other corroborative evidence of her initial statement that Washington was the shooter, and the shooting is the sole basis for probable cause. Caldwell's statement is the most important evidence connecting Washington to the shooting. As a result, I have considered the omission very carefully.

Caldwell initially reported to Officer Foxworth that she saw Washington walking toward her and shooting at her. "She said she recognized him because they have dated on and off over the past five years and she saw his face during this incident." Ex. A at 4. The detail of this statement combined with Washington's statement to her that he had something for her when the shots rang out, the records indicating both Washington's and her cell phones were in use at the

time of the shooting, as well as the four other 911 calls about the shots, provide the necessary probable cause to search Washington's residence and cars.

Detective Halpin explicitly noted that Caldwell subsequently told him she didn't actually see who the shooter was. He did not mention Caldwell's statement that someone else told her Washington was not the shooter. Were this statement added to the affidavit, however, the probable cause determination would not change. Caldwell refused to give any further information about who the shooter was or who told her the shooter was not Washington. Adding the statement only makes her recantation suspicious, and does not affect the believability of her initial identification.

Finally, defendant contends that Detective Halpin should have included Caldwell's question of Washington on the phone, "Did you just shoot at me?" He suggests the fact that she asked the question meant she did not think Washington was the shooter. I disagree. If Caldwell's question and Washington's response were included in the affidavit, the information would only bolster probable cause. As the government contends, her question was an indication of disbelief, and not an indication she was unsure of the shooter's identity. She did not say, "Did you hear that? Somebody just fired a gun at me. Since you're close by, maybe you can figure out who it was." Gov't Supp. Mem. at 4. Furthermore, the fact that Washington did not answer Caldwell's question supports Caldwell's identification of Washington as the shooter. The normal response to such a question would be, "What? Are you hurt? Do you need help? I'll be right there," not heavy breathing.

In sum, having closely evaluated the omissions, I conclude that Detective Halpin's failure to include all of Caldwell's statements about the identity of the shooter does not affect the probable cause determination.

Page 12 - OPINION AND ORDER

C.    <u>Contacts between Washington and his Probation Officer</u>

P.O. McCord received information from Washington that he denied firing shots at Caldwell. P.O. McCord also received a call from Caldwell reporting that Caldwell incorrectly identified Washington as the shooter. There is no evidence, however, that Detective Halpin received this information from P.O. McCord. P.O. McCord's notes indicate only that she left a message for Detective Halpin about defendant's possible involvement with the shooting. In response, the detective told her he was still investigating, and requested that she provide information as she learned it. Detective Halpin testified that he does not think he talked with P.O. McCord about what defendant reported to her. Accordingly, if he had that information, there is no indication its omission from his affidavit was anything more than negligence or innocent mistake.

Washington had repeated contacts with his probation officer, which Detective Halpin knew about, and this information was not included in the affidavit. Defendant explains that this information is important because the affidavit gave the impression that Washington was "at large," when he was available and amenable to questioning.

I disagree with defendant's characterization of the affidavit as giving the impression that defendant was not available for questioning. Nothing in the affidavit references the officers' inability to find Washington after the shooting was reported. Furthermore, the affidavit states that the officers watched Washington go into his probation officer's building for a meeting on December 20, 2006. Accordingly, I conclude that even if the other contacts between Washington and his probation officer were added to the affidavit, the information does not negate probable cause.

D.     Herring's Presence at the Time of the Incident

Defendant asserts that Detective Halpin should have included a statement that Herring was present and did not see who fired the shots. He argues that Detective Halpin failed to take measurements, count the number of steps on which Caldwell was sitting, and failed to draw any diagrams of the location. He suggests the fact that Herring did not see the shooter would further support that Caldwell was wrong about the identity of the shooter. I fail to see how these items would negate probable cause if included in the affidavit. Defendant does not provide evidence that someone sitting in a car parked on the street below a flight of steps could see what happened 20 to 30 feet away. Herring's presence at the time of the shooting does not affect the probable cause finding.

E.     Caldwell's Criminal History

Detective Halpin failed to include Caldwell's criminal history. She was convicted on September 23, 2002 for Delivery of a Controlled Substance in the Second Degree in Multnomah County Circuit Court, and she was sentenced to 60 days at a work-release center, with 36 months of probation. On November 12, 2002, she was found in violation of probation and served 10 days in jail. On January 22, 2003, she was again found in violation of probation and served eight days in jail. On January 9, 2004, she was found to be in violation of probation again and served six months in jail, with early release to an in-patient drug facility. She received two years of post-prison supervision. On April 27, 2005, she was convicted of Assault in the Fourth Degree and sentenced to 60 days in prison with 36 months' probation. On November 6, 2006, a warrant for probation violation issued after the police received a report from Lavonne Johnson that Caldwell had stabbed her five times on October 26, 2006.

Even had Caldwell's criminal history been included in the affidavit, the information does not tend to negate probable cause. Her convictions do not involve dishonest behavior, and there is no indication she was trying to curry favor with the police. There is no basis to believe the information would have materially affected the judge's assessment.

F.    Washington's Arrest

When he was arrested, Washington had no guns or contraband on his person or in the car, and he complied with all police directives. This information was not included in the affidavit.

The government argues that although there were no drugs on Washington or in the car at the time of his arrest, such contraband was in the car just moments before. The passengers had "bailed out and tried to dispose of the drugs as they fled the area." Gov'ts' Res. at 7.

I agree with the government. Inclusion of defendant's arrest would not have affected the judge's evaluation of probable cause.

G.    Remaining Omissions

Detective Halpin failed to include the four police contacts Washington had during this period, and that Washington had consented to a search of his car. Detective Halpin testified that he was unaware of these other police contacts. Defendant has offered no evidence disputing this statement. Detective Halpin's failure to discuss these police contacts cannot be deemed a reckless disregard for the truth.

Detective Halpin told P.O. McCord that he was still investigating the shooting. Defendant argues that the statement should have been included because it demonstrates the "tenuous state of this shooting investigation." D.'s Reply at 3. This is not the kind of statement that must be included in a warrant affidavit, and defendant has offered no evidence

demonstrating that Detective Halpin's failure to include it was done with reckless disregard for the truth.

In sum, I deny defendant's motion to suppress physical evidence on the basis of material omissions in Detective Halpin's affidavit.

II.   Nexus Between Criminal Activity and 5295 NE 75th Avenue

Defendant states that the search warrant does not contain sufficient facts to connect the triplex unit with evidence of a crime. I disagree. The warrant connects Washington with the shooting and with the triplex unit, providing a substantial basis for finding with a "fair probability that contraband or evidence of a crime" would be found at the triplex unit. I deny defendant's motion on this basis.

III.   "Expert" Opinion

Defendant argues that Detective Halpin's boilerplate opinions about the likelihood of certain individuals to behave in certain ways generally does not support probable cause. Defendant characterizes the opinions as "offender topology" and argues Detective Halpin fails to connect these general opinions with Washington. Defendant relies on United States v. Weber, 923 F.2d 1338 (9th Cir. 1990).

The government does not respond to this argument.

In Weber, the government was trying to support its "chain of inferences" with expert testimony about "child molesters," "pedophiles," and "child pornography collectors" without any evidence that the target of the warrant was a "child molester." 923 F.2d at 1345. In contrast, here the government has more than a "chain of inferences" that Washington shot at Caldwell. Additionally, Detective Halpin's expert opinion describes his experience with drug dealers and

people who use firearms along with evidence that Washington falls into both categories. I deny

defendant's motion on this basis.

IV.    <u>Warrant Too Expansive</u>

Defendant contends that the warrant contains overly broad language about the things to

be seized:

> [F]irearms and firearms accessories, such as, <u>but not limited to</u> the firearms
> themselves, ammunition, shell casings, bullets, magazines, cleaning equipment,
> holsters, gun boxes and cases, safes and/or lock boxes, trigger locks, gun parts and
> tools, targets, receipts and bills of sales, cell phones and their electronic
> memories, photographs, videotape, and personal correspondence, and evidence of
> violation of Oregon Revised Statutes regarding unlawful possession and/or
> delivery of controlled substances including, but not limited to cocaine, marijuana,
> scales and packaging material.

Ex. A at 2 (emphasis added). Defendant suggests that the "but not limited to" language is not

narrow enough to satisfy the particularity requirement of the Fourth Amendment. <u>Cf.</u> <u>United</u>

<u>States v. Washington</u>, 797 F.2d 1461, 1492 (9th Cir. 1996) ("but not limited to" in warrant

narrowed by "involvement and control of prostitution activity"). As a result, the officers had

"unfettered access to virtually everything in the apartment." D.'s Mot. at 17.

The government does not respond to this argument.

Like the court in <u>Washington</u>, I find the language in the affidavit limits the search to

evidence related to firearms and drug possession or sales, making the warrant comply with the

particularity requirement of the Fourth Amendment. <u>See</u> U.S. Const., Amend. IV (warrant must

"particularly describ[e] the place to be searched, and the persons or things to be seized.").

///


///

## CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress Physical Evidence (#25) is

denied.

IT IS SO ORDERED.

Dated this _____18th_____ day of August, 2008.

Garr M. King
United States District Judge